MAKAR, J.,
Specially concurring.
On a rainy afternoon in May 2012, J.W.A. stole a super-charged 1997 Pontiac Grand Am with “all the bells and whistles” from a hospital parking lot, driving it through a flooded area where it stalled and-pertinent to this appeal-stopped running for the last time. He pled guilty to grand theft auto, was adjudicated delinquent, and now appeals the restitution order of $2,850, which reflects the Bluebook value of the defunct vehicle.
At the restitution hearing, the car’s owner, amateur auto mechanic Dontel Austin, testified, as did his fiancée, Latoya Whiting, who had driven the car to her job at the hospital the day it was stolen. Ms. Whiting worked at the hospital with J.W.A.’s mother, who said her son had taken the car; J.W.A. confessed his involvement to Ms. Whiting, saying the car was driven through a flooded area where it stalled and was abandoned. Ms. Whiting testified that the car was in “perfect” condition prior to its theft other than a broken needle on the gas gauge. The officer who recovered the car the evening of its theft, however, was unable to start it because the engine would not turn over; the husband of the impound lot clerk, who is a certified mechanic, was unsuccessful in getting it to start as well.
Neither Ms. Whiting nor Mr. Austin could get it to start when they went to recover it a few days later at the police impound lot. When the car failed to start in the impound lot, Mr. Austin left and brought back a newly-purchased battery, which failed to start the car. After more remediation attempts failed, he paid to have a tow truck take the car to his home, where he continued to try to get the Grand Am to start. Over the next few days, Mr. Austin, who “knows his way around a vehicle pretty good” and does all repair and maintenance work on his own cars, spent much time and money on trying to get the Grand Am to start. He “tried everything” to get the engine to work. He took it apart and tried to get the car to “crank” but it was “seized up” and would not respond. While inspecting the internal engine parts, he discovered rust on the ports and valves, which was not there previously. Given all the new-found internal damage to the engine, he felt he “couldn’t do nothing” more with it because it “was shot.” He felt his options were to either replace/rebuild the special engine or buy a new car. He got a written estimate of $5,200 from an automotive repair group to replace the unique engine necessary for the supercharged car; the car’s Bluebook value was $2,850; he did not have an estimate on rebuilding the existing engine.
J.W.A.’s counsel, who asked no questions of either Ms. Whiting or Mr. Austin and presented no witnesses or evidence, stipulated to and did not contest the amount of the written estimate or the Bluebook value. Instead, J.W.A. argued only that the evidence failed to establish that driving the car into the water caused the extent of damage shown. The trial court expressed some doubt about how quickly the rust formed inside the engine (thinking it formed in hours versus days later when it was discovered), but awarded Mr. Austin the $2,850 Bluebook value of *914 the vehicle, saying it made little sense to put a new $5,200 engine in a car worth only half that amount.
Victims of crime in Florida are entitled to restitution, § 775.089, Florida Statutes, the award of which is reviewed for an abuse of discretion. State v. Childers, 979 So.2d 412, 415 (Fla. 1st DCA 2008) (citing section 775.089(7), Florida Statutes (2007)). The State’s statutory burden to prove restitution is the preponderance of the evidence standard. § 775.089(7), Fla. Stat. (2007); Fisher v. State, 722 So.2d 873 (Fla. 1st DCA 1998). A trial court need only find, by competent substantial evidence, that a loss was causally connected to the offense, either directly or indirectly, and that it bears a significant relationship to the offense. Koile v. State, 902 So.2d 822, 824-25 (Fla. 5th DCA 2005), approved and remanded, 934 So.2d 1226 (Fla.2006).
Preliminarily, no appellate issue exists regarding the market value of the Grand Am or the cost of replacing its unique (but ruined) engine. J.W.A. stipulated to these amounts below, and does not make an issue of the magnitude of the loss sustained.
Rather, on appeal J.W.A. claims only that the trial court “abused its discretion in imposing restitution without proof the damage was caused by Appellant’s offense, grand theft auto.” He seeks reversal because the “award in this case is based on doubtful evidence that two days of rust destroyed the engine” thereby failing to establish causation. In essence, he claims no competent evidence supports the conclusion that stealing a car and driving it through a flooded area can result in the total loss of the engine or the value of the car.
The uncontested evidence established that (1) the car ran perfectly prior to the theft; (2) it was stolen and driven through a flooded area where its engine stalled and could not be restarted; (3) the officer who recovered the car later that evening testified he could not get the car to start; and (4) Mr. Austin testified the car would not start despite extensive remedial efforts over the next several days. Under these circumstances, it is clear that the damage to the car was caused either directly or indirectly by driving the stolen car through a flooded area where it stopped running; at the very least, the damage was related to J.W.A.’s criminal episode. See § 775.089, Fla. Stat. Indeed, cars that have been in flood waters are almost presumed to have serious, often irremediable, problems, leading to consumer warnings by state attorneys’ general and consumer advocates.[1] Flood vehicles from Hurricane Katrina and Superstorm Sandy have accentuated and highlighted the problem.
While the only evidence of the cause of the damage came from the testimony of the owner-it was more than sufficient. See State v. Hawthorne, 573 So.2d 330, 333 n. 6 (Fla.1991). Mr. Austin was qualified to testify about the extent of the damage that caused vehicle to cease operating based on his experience of exclusively maintaining his cars. B.L.N v. State, 722 So.2d 860 (Fla. 1st DCA 1998), which was not a causation case, is distinguishable. The only issue preserved below and framed on appeal by J.W.A. was whether the theft of the auto and driving it into a flooded area caused the loss sustained. The State easily met its burden to show it did. Moreover, the trial judge erred in speculating about the rust in the engine; he was skeptical that the rust could have formed in six *915 hours. The record shows, however, that the rust was first discovered at least two days after the car’s recovery. That the flooded engine would not start the evening the car was stolen, does not mean rust must have formed at that point; flooding of the engine alone could have caused the engine to cease operating. That rust might form over the following two days, causing the engine further damage, is the logical proof of events the State presented.
In summary, proving restitution should not be a gauntlet of legal “gotchas” that crime victims must walk; nor is it an opportunity to cash in on an unfortunate event. Here, Mr. Austin invested much of his personal time, effort, and money to mitigate a loss he did not even cause. Beyond all his remediation efforts, he spent time getting an estimate for the engine and had to prepare for, attend, and testify at a restitution hearing; so did his fiancée. Flood cars are uniquely susceptible to catastrophic damage, potentially rendering them worthless. That the Grand Am was reduced to its modest Blue-book value of $2,850 under these circumstances is supported by competent substantial evidence and common sense.

. See, e.g., Ellen Taverna, Clearing the Road of Flood-Damaged Vehicles, NAAGazette (National Association of Attorneys General), Feb. 18, 2009 (Vol.3. No. 1), http://www.naag.org/ clearing-the-road-offlood-damaged-vehicles. php